Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL I

| | | |
|---|---|---|
| GISSEL BON ROSARIO<br><br>Demandante - Peticionario<br><br>v.<br><br>DORADO HEALTH, INC. h/n/c MANATI MEDICAL CENTER, et al.<br><br>Demandada - Recurrida | TA2026CE00455 | *Certiorari* procedente del Tribunal de Primera Instancia, Sala de Arecibo<br><br>Civil núm.: AR2021CV00796 (404)<br><br>Sobre: Daños y Perjuicios |

Panel integrado por su presidente, el juez Sánchez Ramos, la jueza Romero García y el juez Pérez Ocasio.

Sánchez Ramos, juez ponente

**SENTENCIA**

En San Juan, Puerto Rico, a 26 de mayo de 2026.

En un caso de daños por supuesta impericia médica, el Tribunal de Primera Instancia ("TPI") determinó, por la vía sumaria, que la parte demandante no podría recobrar de un hospital más allá de unos límites de responsabilidad establecidos por ley para casos en los cuales la impericia haya ocurrido como parte del ejercicio de labores docentes. Según se explica en detalle a continuación, concluimos que erró el TPI porque el récord, en esta etapa, no permite concluir que la alegada impericia haya ocurrido en el contexto del ejercicio de la docencia en el hospital demandado.

I.

En junio de 2021, el Sr. Héctor Velázquez León (el "Paciente"), su esposa (la Sa. Gisselle Bon Rosario), la sociedad legal de gananciales por ambos compuesta, y sus hijos, Génesis Jacob y Caleb, todos de apellido Velázquez Bon (en conjunto, los "Demandantes"), presentaron la acción de referencia, sobre impericia médica (la "Demanda"), en contra de Dorado Health, Inc. h/n/c Manatí Medical Center (el "Hospital"), y de los Dres. Francisco Laforet Avilés, Porfirio Franqui Flores, Tulio Villanueva Rozas,

Eduardo J. González y Alberto García Orta, con sus respectivas esposas, sociedades legales de gananciales y aseguradoras[1].

En síntesis, los Demandantes alegaron que los demandados no le brindaron tratamiento adecuado al Paciente en conexión con un accidente cerebrovascular y que el Paciente sufrió daños a raíz de ello.

Luego de contestar la Demanda, y de otros trámites procesales, el Hospital, en julio de 2025, presentó una *Solicitud De Sentencia Sumaria Parcial Sobre La Aplicación De Los Limites De Responsabilidad Establecidos En La Ley 136 De 2006* (la "Moción"). Esencialmente, el Hospital arguyó que, según un número de hechos incontrovertidos, aplicaban a este caso los límites estatutarios establecidos para beneficio de ciertas instituciones médicas que ejercen labor docente. Hizo referencia a que es parte del Centro Médico Académico Regional del Suroeste, mantiene una acreditación activa por el *Accreditation Council for Graduate Medical Education*, tiene un programa funcional de residencia en Medicina de Familia, y que, en el cuidado del Paciente, participaron tanto médicos como residentes del programa académico.

Los Demandantes se opusieron a la Moción; además de reseñar que los documentos usados por el Hospital en apoyo de la Moción no habían sido provistos durante el descubrimiento de prueba, arguyeron que, como cuestión de derecho, no era suficiente, para ser acreedor a los límites estatutarios en controversia, demostrar que, en algún momento de la estadía del Paciente en el Hospital, algún residente haya "participa[do]" en su tratamiento. El Hospital luego replicó, y los Demandantes duplicaron.

---

[1] Posteriormente, los Demandantes solicitaron el desistimiento sin perjuicio en cuanto a los doctores González Pons, García Orta y Villanueva Rozas. Mediante una *Sentencia Parcial*, el TPI ordenó el archivo, sin perjuicio, de la causa de acción en contra de los referidos médicos.

Mediante una *Sentencia Sumaria Parcial* notificada el 12 de marzo (el "Dictamen"), el TPI declaró con lugar la Moción; determinó que los siguientes hechos no estaban en controversia:

1. Al momento de los hechos alegados en la Demanda, el Hospital contaba con un Contrato de Afiliación suscrito con la Universidad de Medicina de Ponce y su Programa de Residencia, vigente desde el 31 de julio de 2019, con una duración inicial de seis (6) años y renovación automática.

2. Lo anterior se acredita mediante declaración jurada suscrita por el Dr. Norman Ramírez Lluch, quien actúa como oficial institucional a cargo del sistema académico del Hospital ("Designated Institutional Officer – DIO").

3. Como DIO del Hospital, el Dr. Norman Ramírez Lluch supervisa las labores realizadas por los directores de programas, médicos asistentes (attendings) y otros facultativos, asegurando el cumplimiento de las funciones académicas del taller clínico acreditado en Medicina de Familia.

4. El programa de residencia del Hospital en Medicina de Familia está acreditado a su vez por el Accreditation Council for Graduate Medical Education (ACGME).

5. El Centro Médico Académico Regional del Suroeste (CMAR) contaba para el momento de los hechos con el Reglamento General Número 7824, con fuerza de ley y vigente desde el 9 de junio de 2008.

6. Durante el periodo comprendido entre el 20 de junio de 2020 al 11 de julio de 2020, médicos residentes de medicina participaron activamente, junto con los médicos asistentes, en la atención clínica y cuidado hospitalario que se le brindó al Demandante mientras estuvo hospitalizado en el Manatí Medica Center. Las actuaciones de todo el componente hospitalario se realizan, conforme se define la actividad de docencia por parte del LCME y ACGME según recoge la Ley 136-2006, como parte del programa educativo bajo la Ley Núm. 136-2006.

7. El Hospital ofrece un programa de residencia en Medicina de Familia para estudiantes provenientes de diversas instituciones, incluyendo la Escuela de Medicina de Ponce, la Escuela de Medicina San Juan Bautista, la Escuela de Medicina y Ciencias de la Salud de San Kitts y la Escuela de Medicina de Antigua.

8. La Escuela de Medicina de Ponce cuenta con acreditación vigente por el Liaison Committee on Medical Education (LCME) para sus programas de residencia.

9. A la fecha de los hechos alegados en la Demanda (20 de junio al 11 de julio de 2020), el Hospital contaba con

un número específico de 18 médicos residentes en Medicina de Familia, acreditados por el ACGME.

10. El Dr. Gil Nieves, en su capacidad de residentes del Programa de Medicina de Familia del Hospital, participó en el tratamiento médico y cuidado hospitalario que se le brindó al Demandante durante el periodo de su admisión hospitalaria.

11. El Dr. Gil Nieves, prestó tratamiento médico al Demandante y contaba con un Family Medicine Residence Appointment Contract.

12. En la Contestación a la Demanda presentada por el Hospital, consta como defensa afirmativa que el Hospital está debidamente afiliado al CMAR del Suroeste y, consecuentemente, protegido por las disposiciones de la Ley Núm. 136.

13. El MMC exhibe en sus instalaciones letreros visibles que lo identifican como hospital certificado y acreditado como centro de enseñanza e investigación conforme a la Ley Núm. 136-2006. Tales avisos también informan que los tratamientos médicos pueden ser provistos por profesionales aliados de la salud. Véase Anejo 8, fotografías sobre notificación en área de admisiones, en la caja principal, en centro de imágenes, en las clínicas ambulatorias, en el laboratorio, en el lobby, en preadmisiones y en sala de emergencia.

14. El Dr. Armando Cruzado, médico tratante del paciente, cuenta con un Acuerdo de Afiliación con el CMAR del Suroeste, vigente desde el 15 de febrero de 2018, bajo el rango de profesor asistente.

15. Durante la admisión, los facultativos del Hospital fueron asistidos por médicos residentes en rotación, incluyendo al doctor identificado en los acápites anteriores #10 y #11, adscrito al Programa de Residencia de Medicina de Familia del Hospital.

16. La participación del personal facultativo y de los médicos residentes en el tratamiento del Demandante ocurrió en el curso ordinario de sus funciones educativas y clínicas, conforme a los objetivos del Programa de Residencia en Medicina de Familia del Hospital.

17. El tratamiento brindado al Demandante fue realizado por profesionales que actuaban en cumplimiento de sus deberes docentes y académicos, bajo la estructura del CMAR del Suroeste, conforme al marco normativo de la Ley Núm. 136 de 2006.

A la luz de lo anterior, el TPI concluyó que, en el contexto de este caso, el Hospital se beneficia de los límites de responsabilidad establecidos por ley en conexión con la labor docente que se realiza en ciertas instituciones médicas.

En desacuerdo, el 13 de abril (lunes), los Demandantes presentaron el recurso que nos ocupa; formularon los siguientes señalamientos de error:

Primero: Erró el Tribunal de Primera Instancia al permitir y acoger una solicitud de sentencia sumaria basada en prueba que la parte promovente se negó a producir durante el descubrimiento de prueba, a pesar de haber sido solicitada conforme a los mecanismos de las Reglas de Procedimiento Civil.

Segundo: Erró el Tribunal de Primera Instancia al determinar la aplicabilidad de los límites de responsabilidad de la Ley 136-2006 antes de una adjudicación de negligencia y valoración de daños, proceder que es contrario a lo resuelto en *Negrón Castro v. Soler Bernardini*, 2025 TSPR 96, con el agravante de que dicha interpretación que hace inoperante el eventual derecho de subrogación de los peticionarios al amparo del Artículo 20.030(3) del Código de Seguros.

Tercero: Erró el Tribunal de Primera Instancia al determinar la inexistencia de una controversia de hechos sobre la aplicabilidad de la Ley 136-2006, al concluir que tal protección es automática por el mero estatus institucional de un hospital como centro académico o por la participación de personal docente, independientemente de que el acto negligente haya ocurrido o no en el ejercicio de funciones académicas y docentes.

El 15 de abril, le ordenamos al Hospital mostrar causa por la cual no debíamos expedir el auto de *certiorari* y revocar el Dictamen. El Hospital presentó su alegato, en el cual reproduce lo planteado en la Moción. Resolvemos[2].

II.

La sentencia sumaria es un mecanismo procesal que se utiliza para lograr la solución justa, rápida y económica de una controversia donde resulta innecesario celebrar un juicio en su fondo. *Meléndez González v. M. Cuebas, Inc.*, 193 DPR 100, 109 (2015). Este mecanismo procede cuando no existe una controversia real sobre hechos materiales. Un hecho es material cuando puede afectar el resultado de la reclamación de acuerdo con el derecho

---

[2] Luego, el Centro Médico Académico Regional del Sur-Oeste solicitó que se permitiera su participación como *amicus curiae* y, simultáneamente, presentó su alegato. Hemos determinado declarar con lugar la referida solicitud.

sustantivo aplicable. *Ramos Pérez v. Univisión*, 178 DPR 200, 213 (2010).

La Regla 36 de las de Procedimiento Civil, 32 LPRA Ap. V, R. 36.3, impone un número de requisitos tanto al proponente de la sentencia sumaria como al que se opone a la misma. La moción de sentencia sumaria debe contener: una exposición breve de las alegaciones de las partes, los asuntos litigiosos en controversia, la causa de acción sobre la cual se solicita la sentencia sumaria, una relación concisa y organizada en párrafos enumerados de todos los hechos esenciales y pertinentes sobre los cuales no hay controversia, con indicación de los párrafos o páginas de la prueba documental donde se establecen los mismos, la argumentación del derecho aplicable y el remedio que se solicita. 32 LPRA Ap. V, R. 36.3(a).

De igual forma, la parte que se opone a la sentencia sumaria tiene que cumplir con las exigencias de la Regla 36. En particular, debe enumerar aquellos hechos materiales de buena fe controvertidos y aquellos sobre los cuales no hay controversia. En ambos casos, por cada hecho, se tienen que indicar los párrafos o páginas de la prueba documental que establecen o impugnan ese hecho. 32 LPRA Ap. V, R. 36.3(b). Así pues, la parte que se opone a que se dicte sentencia sumariamente "no podrá descansar solamente en las aseveraciones o negaciones contenidas en sus alegaciones, sino que estará obligada a contestar en forma tan detallada y específica, como lo haya hecho la parte promovente". 32 LPRA Ap. V, R. 36.3(c). Los hechos enumerados en la moción de sentencia sumaria que no sean debidamente controvertidos podrán considerarse admitidos. 32 LPRA Ap. V, R. 36.3(d). De forma similar, "[e]l tribunal no tendrá la obligación de considerar aquellos hechos que no han sido específicamente enumerados". *Íd.*

Cuando un tribunal evalúa y analiza una moción de sentencia sumaria, no está obligado a resolverla apoyado únicamente en los documentos que se presentan con la moción, sino que se deben considerar todos los documentos en los autos en los que surja alguna admisión hecha por alguna de las partes. *Const. José Carro v. Mun. Dorado*, 186 DPR 113, 130 (2912). De haber alguna duda acerca de la existencia de una controversia sobre los hechos medulares y sustanciales del caso deberá resolverse contra la parte que solicita la moción, haciendo necesaria la celebración de un juicio. *Rivera et al. v. Superior Pkg., Inc. et al.*, 132 DPR 115, 133 (1992). (Citas en el original suprimidas).

Además, la omisión en presentar evidencia que rebata aquella presentada por el promovente, no necesariamente implica que procede dictar sentencia sumaria de forma automática. *Mun. De Añasco v. ASES et al.*, 188 DPR 307, 327 (2013); *Córdova Dexter v. Sucn. Ferraiuoli*, 182 DPR 541, 556 (2011); *González Aristud v. Hosp. Pavía*, 168 DPR 127, 138 (2006). Solo procede que un tribunal dicte sentencia sumariamente cuando, de las alegaciones, deposiciones, contestaciones a interrogatorios y admisiones ofrecidas, en unión a las declaraciones juradas y otra evidencia, no surja controversia real sustancial sobre algún hecho material y, además, proceda como cuestión de derecho. 32 LPRA Ap. V, R. 36.3(e). Es decir, "cuando surge de manera clara que, ante los hechos materiales no controvertidos, el promovido no puede prevalecer ante el derecho aplicable y el Tribunal cuenta con la verdad de todos los hechos necesarios para poder resolver la controversia". *Meléndez González*, 193 DPR a las págs. 109-110, citando a *Const. José Carro*, 186 DPR a la pág. 129 y a *Nieves Díaz v. González Massas*, 178 DPR 820, 868 (2010).

### III.

La Ley 136-2006 (Ley de los Centros Médicos Académicos Regionales de Puerto Rico, según enmendada, 24 LPRA sec. 10035 y ss., o "Ley 136") fue aprobada para facilitar el acceso y ampliar la oferta de servicios médicos disponibles a la ciudadanía. Esta legislación extendió, a instituciones denominadas como un Centro Médico Académico Regional ("CMAR"), los limites monetarios dispuestos en el Artículo 7 de la Ley Núm. 104 de 29 de junio de 1955, 32 LPRA secs. 3077 y ss. ("Ley 104")[3], por los procedimientos médicos que se lleven a cabo allí **en el ejercicio de sus funciones académicas y docentes**.

El Artículo 7 de la Ley 136 establece lo siguiente (24 LPRA sec. 10035) (énfasis suplido):

> Se extenderán las limitaciones impuestas en la Ley Núm. 104 de 29 de junio de 1955, según enmendada, a los Centros Médicos Académicos Regionales, y miembros de facultad de estos, **por los procedimientos médicos que se lleven a cabo en dichos Centros en el ejercicio de sus funciones académicas y docentes**. Dicha limitación establece un máximo de $75,000 por los daños sufridos por una persona y hasta $150,000 cuando los daños y perjuicios se le causaron a más de una persona, o cuando sean varias las causas de acción a que tenga derecho un solo perjudicado. Además, se extenderá la inmunidad para que no sean acumulados en un pleito ante los tribunales o cualquier foro con competencia, a todos los estudiantes, médicos residentes, médicos en programa de internados y médicos en adiestramiento post graduado y/o en entrenamiento de las instituciones médico-hospitalarias públicas y privadas. Lo aquí dispuesto será un eximente de responsabilidad, a los fines de extender la inmunidad absoluta provista en las acciones por daños y perjuicios por actos de impericia médico-hospitalarias públicas y privadas como parte de un contrato como médico residente con el Departamento de Salud de Puerto Rico, con la Universidad de Puerto Rico o con un Programa de Educación Médica Graduada acreditado por el "Accreditation Council of Medical Education" (ACGME). Se establece que en los casos en donde aplica la inmunidad absoluta los médicos en programa de internado y residentes estarán exentos de mantener una póliza de responsabilidad por impericia médica según dispone el Artículo 41.050 del Código de Seguros de Puerto Rico. (Énfasis suplido).

---

[3] Los límites son setenta y cinco mil ($75,000.00) por persona y ciento cincuenta mil ($150,000.00) por evento cuando concurren varios reclamantes.

La Ley 136 tuvo el efecto de imponer límites monetarios a la responsabilidad de los CMAR y a los facultativos que ejercen labores docentes en estos, y no el de conferirles inmunidad absoluta ante cualquier reclamación por daños y perjuicios por impericia médica. *Negron Castro et al. v. SLG et al.*, 2025 TSPR 96, 216 DPR __ (2025), citando a *Ortiz et al. v. Hosp. San Lucas et al.*, 205 DPR 222, 229-230 (2020); *Rodríguez Figueroa et al. v. Centro de Salud*, 197 DPR 876, 884-885 (2017).

Por otro lado, el Artículo 41.050(vii) del Código de Seguros, 26 LPRA sec. 4105(vii), deja claramente establecido a cuáles instituciones y profesionales de la salud les aplica el límite de responsabilidad de la Ley 136-2006: "a los Centros Médicos Académicos Regionales de Puerto Rico, sus estudiantes y miembros de facultad cuando recaiga sentencia por actos constitutivos de impericia médica hospitalaria (malpractice) **cometida por sus estudiantes y miembros de su facultad en el desempeño de sus funciones docentes**". (Énfasis provisto).

IV.

Examinado detenidamente el récord del caso de referencia a la luz del marco jurídico antes expuesto, concluimos que cometió error de derecho el TPI. Ello pues el récord no sustenta lo que era necesario para concluir que el Hospital es acreedor, en este caso, del beneficio establecido en la Ley 136. Es decir, no hay apoyo en el récord para la conclusión de que la imputada impericia fue "cometida por … estudiantes y miembros de [la] facultad en el desempeño de sus funciones docentes", o que ocurriese en el contexto del "ejercicio de sus funciones académicas y docentes". 26 LPRA sec. 4105(vii); 24 LPRA sec. 10035. Puesto de otra forma, el error del TPI consistió en partir de la premisa de que, para ser acreedor al referido beneficio en este caso, el Hospital únicamente

tenía que demostrar que es un CMAR y que algún estudiante, en algún momento, atendió al Paciente durante su estadía.

En efecto, el Hospital falló en demostrar que la impericia imputada fuese atribuible al ejercicio de las funciones académicas del programa de residencia de medicina. Ciertamente, docentes y estudiantes del programa de residencia pueden haber intervenido en el cuidado médico que se le ofreció al Paciente durante su estadía en el Hospital. No obstante, el récord está totalmente huérfano de prueba que establezca que la impericia imputada se cometió en el contexto del ejercicio de la función docente por la facultad del Hospital. Para que un acto u omisión sea parte del ejercicio de la función docente del Hospital, es necesario, cuando menos, que un estudiante haya estado físicamente presente o, cuando menos, que el estudiante haya participado, de algún modo, del acto u omisión. El récord no contiene prueba alguna que demuestre lo anterior en cuanto a los actos y omisiones que se alega formaron parte de la impericia en este caso.

En fin, examinados *de novo* los documentos que acompañan la Moción, concluimos que el TPI cometió error de derecho al concluir que le aplican al Hospital las limitaciones de responsabilidad de la Ley 136, a pesar de que no se ha demostrado que la impericia ocurriese en el contexto del ejercicio de la docencia por el Hospital.

Subrayamos que, al continuar los procedimientos, el TPI deberá posponer cualquier determinación sobre la posible aplicación de los límites en controversia hasta el final del litigio. Intentar adjudicar este asunto en esta etapa, lejos de simplificar el proceso, lo complica, y no es necesario. Por ejemplo, el tribunal y las partes podrían estar enfrascándose en una controversia académica porque, eventualmente, podría determinarse que no hubo impericia, o bien que los daños son, de todas formas, menores a los límites. Ahora

bien, concluido el proceso, si se determinase que hubo impericia y que los daños probados exceden los límites, sería oportuno y necesario determinar si aplican los referidos límites, ya con la ventaja de contar con un récord completamente desarrollado.

V.

Por los fundamentos que anteceden, se expide el auto de *certiorari*, se revoca el dictamen recurrido, y se devuelve el caso al Tribunal de Primera Instancia para trámites ulteriores compatibles con lo aquí resuelto y expuesto.

Lo acuerda y manda el Tribunal, y lo certifica la Secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones